IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DR. MICHAEL J. DUBIN,

                      Plaintiff,                            OPINION AND ORDER

    v.

                                                        10-cv-35-wmc

BOARD OF MADISON AREA TECHNICAL
COLLEGE DISTRICT and MADISON AREA
TECHNICAL COLLEGE-MADISON,

                      Defendants.

---

Plaintiff Dr. Michael J. Dubin brought this civil lawsuit under Title VII of the Civil Rights Act of 1964 against defendants Board of Madison Area Technical College District (the "Board") and Madison Area Technical College-Madison ("Madison College") after his contract to teach at Madison College was not renewed in 2009. Dubin contends that his former employer, Madison College, acting through its Board, discharged him because of his religion and in retaliation for having made charges of discrimination against co-workers. *See* 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a). Defendants maintain that they are entitled to summary judgment on both claims because the undisputed facts show they were totally unaware of Dubin's religion and his complaints of discrimination. Additionally, defendants maintain that they had legitimate reasons for not renewing his contract.

Because no reasonable jury could find on the undisputed facts here that Dubin was discriminated against on the basis of his religion, defendants' motion for summary judgment on Dubin's discrimination claim will be granted. Viewing the facts in a light

most favorable to Dubin, however, genuine issues of material fact remain as to Dubin's retaliation claim. It will be up to a jury to decide whether Dubin was in fact retaliated against for making complaints about discrimination.


FACTS[1]

## I.  Dubin's First Six Years at Madison College

Plaintiff Michael Dubin was hired by then associate dean Janie Wimberly to be an adjunct instructor at Madison College in 2000. A year later he was moved to a temporary, full-time instructor position. Between 2001 and the spring of 2006, Dubin continued as a temporary, full-time instructor, passing an initial, six-semester probationary period and having his teaching contract renewed by Madison College every semester.

Wimberly was Dubin's direct supervisor from 2000 to 2006 and would observe him in the classroom at least once a year. During that time, she noted that his "teaching acumen" was "exemplary." Dubin was available to his students beyond his required office hours and Wimberly never received any complaints about him from any student, faculty or administrative staff. Wimberly used Madison College's Probationary Faculty

---

[1] The following facts are taken from the parties proposed findings of fact and, unless otherwise noted, are undisputed. As a general matter, some of plaintiff's proposed findings of fact are not included because they are based on inadmissible hearsay, sometimes multiple layers of inadmissible hearsay. (*See, e.g.*, Pl.'s Additional PFOF (dkt. #64) ¶18 ("[Dubin] had been told by one of his students, Megan Parrish, that Janet Stevens . . . had stated . . . .") and ¶96 ("Thomas had been informed by a colleague . . . that Delcourt told him . . . .").)

Evaluation process to review Dubin each year, noting that he "met and exceeded [Madison College's] expectations of him." (Pl.'s Additional PFOF (dkt. #64) ¶12.)

Dubin also worked with Wimberly in developing Madison College's political science curriculum, even developing and teaching a Political Theory course. Classes taught by Dubin were highly sought after by students. The classes filled quickly and, at times, were moved to larger classrooms to accommodate student demand. Wimberly attributed the growth in several classes to Dubin's teaching. Specifically, she believed that the student demand for American National Government, State and Local Government and American Foreign Policy were the result of Dubin's teaching efforts and skills, including, in particular, communication skills.

## II.  Full-Time Political Science Instructor Position

Between late 2005 and early 2006, Madison College posted an opening for a full-time, political science instructor. The then Dean of Arts & Science Department, Jodi Thrush, told Dubin that in her mind his background, education and teaching ability made him the most qualified candidate for the position. Dubin became one of the final, two candidates for the position; the other candidate being African-American, who taught at another institution. Dubin was not hired for the position and was told that although he was the most qualified candidate, the decision was driven by a perceived need for greater diversity among the faculty.

In March 2006, Dubin's attorney, Michael Fox, sent a letter to Madison College alleging that Dubin was denied the position because of his race in violation of Title VII.

Dubin and Madison College reached a settlement agreement in August 2006 with respect to Dubin's discrimination allegations. The agreement resulted in Dubin being hired as a full-time History instructor in the Arts and Science Center.

## III.  Religious Hostility from Co-workers

Dubin is Jewish.  Upon becoming a full-time instructor, Dubin began to experience hostility toward and discriminatory comments about his religion from co-workers, primarily he claims from faculty members Richard Shaten and Janet Stevens. Dubin claims that Shaten described himself as an "anti-Semitic Jew," was uncivil with Dubin and acted aggressively toward him, including calling Dubin a liar, accusing him of trying to dupe co-workers and even calling him "a litigious Jew."  Dubin was offended by these comments and felt ostracized, resulting in his seeing a psychologist in the summer of 2007.  Shaten, who was also the lead teacher in the Social Science/History department, refused to discuss Dubin's course development or to approve courses for Dubin to teach.  Dubin claims Stevens also interfered with Dubin's teaching of a political theory course and sent negative emails about Dubin to Madison College employees, as well as to officials with the local union, AFT Local 243.

This hostility culminated in Dubin writing a letter on March 22, 2007, to Madison College's Dean, Jodi Thrush, as well as an associate dean, Todd Stebbins. Dubin, Thrush and Stebbins met shortly after Dubin sent his letter and Dubin's allegations were referred to Madison College's Director of Labor Relations and Diversity,

Will Strycker, who commenced an investigation into the allegations.  Both Shaten and Stevens were informed of the investigation in late March 2007.

On June 19, 2007, Strycker issued a thirteen-page letter outlining his findings and conclusion that Madison College's Policy No. 405 concerning "Non-Discrimination and Non-Harassment" had not been violated.  Strycker informed Dubin that he could request a review of the investigation's findings by the College's president to assure the investigation was thorough and fair.  Dubin did not do so.

## IV.  Delcourt's Arrival at Madison College

Veronica Delcourt was hired as Madison College's Dean of Arts and Sciences Center in July 2007.  Sometime between Delcourt's arrival and September 2007, Stevens sent several emails to Delcourt about Dubin's "situation" at Madison College, his prior complaints of discrimination and other issues.  Additionally, Thrush and Stebbins informed Delcourt about Dubin's previous allegations of discrimination that resulted in the August 2006 settlement agreement.  Delcourt was also informed about Dubin's more recent allegations of anti-Semitism by co-workers, as well as Strycker's investigation.  As a result, Delacourt was obviously aware of Dubin's Jewish faith and of his earlier complaints of discrimination when she met and began supervising Dubin in the fall of 2007.

Among other courses, Dubin taught an international relations course on Tuesdays and Thursdays during the fall 2007 semester.  This course was scheduled to last until 3:45 p.m. on both days.  In late September, Associate Dean Stebbins became aware that

Dubin also taught at Edgewood College at 4 p.m. during that same semester. These circumstances concerned Stebbins because it was difficult to imagine that Dubin could end his Madison College class on time, get to his car, drive across Madison and begin his Edgewood College class by 4 p.m. Stebbins followed up on her concerns by checking on Dubin's classes on October 9 and 16, 2007. On the October 9 visit, Stebbin observed Dubin end class at 3:33 p.m. and on the October 16 visit, Dubin ended class at 3:40 p.m. Stebbin reported his observations to Dean Delcourt.

Performance reviews of Arts and Science instructors were regularly conducted at Madison College. On December 6, 2007, Dean Delcourt conducted a probationary faculty performance review of Dubin. Delcourt recorded a concern that Dubin was too philosophical, that students may not be able to follow his lesson plan and that Dubin was scattered in his organization.

Delcourt additionally observed what she recorded as "events of concern." Overall, she found Dubin had failed to ensure that all students were equally heard and valued in class, noting in particular an interaction, following a student's sympathetic comments toward the War in Iraq and President George W. Bush, in which Dubin vehemently disagreed with the student's views and forced his opinion until the student withdrew from the discussion. Delcourt also noted a concern that Dubin was ending his Madison College course early to get across town to another college.

After her observations, Delcourt prepared a "process improvement letter" for Dubin, raising her concerns about him. She then sent it to Gwen Torkelson, the Director of Madison College's Human Resources Department, to be revised. This was the *only*

process improvement letter prepared by Delcourt between 2007-2009, despite supervising seventeen probationary faculty members during this period.

On December 14, 2007, Delcourt met with Dubin to discuss the specific concerns raised in the letter. One concern raised at that meeting was Dubin's failure to respond to an administrative email about scheduling. Dubin asked why he was being written up for such a concern when other employees, such as Laura Osinski, were not. Dubin claims that Delcourt then explained that he was "special" or "unique" because of his previous legal case with the college and his complaints of anti-Semitism by other instructors. Dubin responded that he had no "case" but that his attorney had merely written a letter questioning possible discriminatory practices. Delcourt is alleged to have then explained that the attorney letter would follow Dubin for the rest of his career at Madison College, at one point specifically asking Dubin whether he actually thought he would be permitted to continue teaching after his complaint.

During this meeting, Delcourt is purported to also have told Dubin that Stevens had complained to her about Dubin's teaching and made disparaging remarks about Dubin being a "monster." In response to Dubin raising his own concerns about continued discrimination from Stevens, Delcourt supposedly told him to "stop complaining." In finishing up the meeting, Delcourt explained that Dubin was receiving a process improvement letter because the college was "covering [its] ass[ ]" in light of his prior complaints. (Pl.'s Additional PFOF (dkt. #64) ¶64.)

A month later, Delcourt sent Dubin a letter summarizing the meeting, as well as Dubin's responses to Delcourt's concerns. Dubin responded in an email noting that he

appreciated Delcourt's efforts to clarify concerns. Dubin did not disagree with Delcourt's recorded observations, but by the time of the summary letter Dubin had successfully remediated Delcourt's concerns.

In February 2008, as part of Madison College's three-part Probationary Faculty Evaluation process, Delcourt provided input and approved Dubin's self-assessment, noting that Dubin helped teach students how to think critically and served on the curriculum committee and as a faculty advisor to a student club. The following August, at a meeting with Dubin, Delcourt assured him that everything was fine and that he had passed probation.

## V. Student Complaints against Dubin

Early in the spring 2008 semester, Delcourt received a detailed complaint about Dubin from a student. The student noted that Dubin began a class he taught on February 7, 2008, twenty-three minutes late. The student further complained that Dubin often started class a couple minutes late and that in a fifty minute class those wasted minutes are important. The student added that Dubin's teaching skills were poor, specifically noting that he often put people on the spot if they spoke and usually would say something embarrassing about the student's comment.

Delcourt advised Dubin of the student's complaint and monitored his interactions with the student. Dubin addressed the student's concerns and rectified the situation. The student stayed in the class and had a positive experience, noting in a letter to Delcourt that Dubin had become one of her favorite teachers and she was taking another

class with him.  The following fall, the student even played a role in Dubin receiving a teaching award from Phi Theta Kappa student honor society.

In mid-summer 2008, Shawna Carter, also an associate dean in the Arts and Sciences Center, spoke with another student who was having difficulty with Dubin.  The student had jokingly responded to a question and Dubin proceeded to make the student feel stupid for her response.  Later in the same class, the student pointed out that Dubin was not lecturing on the course's subject matter and Dubin responded by noting that her comment was an example of freedom.  He told her four or five times that she also had the freedom to leave the class.  At the end of class, Dubin stared at the student and explained that he was teaching the proper subject matter.  The student proceeded to drop the class.

Delcourt received another complaint about Dubin in September 2008.  A parent of a student emailed Delcourt concerning the cancelation of several of her child's classes in the first week of the semester.  One of the classes was taught by Dubin.  Delcourt responded to the parent and sent Dubin a copy of the email and her response.  Delcourt received a complaint from another student about Dubin in September 2008.  This student was in Dubin's American History class and complained that the class contained too much theory and not enough historical content.  The student also claimed that that when he asked Dubin if the class would cover historical events, Dubin responded that the student should leave if interested in actual events and then pointed to the door.  The student also noted that Dubin was often on his cellphone and came late to class.

On December 17, 2008, a student informed Dubin and Stebbins about concerns he had with access to Dubin, as well as Dubin's hostile communication with him.  The student had been trying to reach Dubin by email for several days to obtain final exam questions.  Dubin eventually responded by calling the student and initiating a heated discussion.  The student explained that Dubin had snapped at him, stating "I don't understand what the problem . . . is."  (Defs.' PFOF (dkt. #47) ¶70.)  The student felt that Dubin's interaction was very unprofessional and asked if Stebbins could grade his final paper for fear of Dubin retaliating.  Dubin responded to the student in an email, apologizing for any misunderstanding but explaining that he merely wanted the student to take responsibility for having failed to come and pick-up the take home exam at the given time.

## VI.  Delcourt's Recommendation to Not Renew Dubin's Teaching Contract

In October 2008, Associate Dean Carter informed Delcourt and Stebbins that Dubin had already missed 5 days due to absences.  That same month, Dubin and Delcourt met to discuss Dubin's ongoing concerns about Stevens's hostility toward Dubin.  Delcourt became upset with Dubin and told him that he had not passed his probation period.  Delcourt explained that Dubin's complaints of discrimination were detrimental to his continuing to work at Madison College.  She explained that his absences would be used against him, though they had never been an issue.

As part of the ongoing, probationary faculty review process, Declourt did her second observation of Dubin's teaching on November 7, 2008.  After arriving in the

class, Dubin quickly moved to the board to begin a short, scattered and unorganized lecture. Dubin passed out a limited handout and over thirty minutes of the fifty minute class was devoted to group activity and discussion. Once Dubin moved on from a group, the group did not discuss class issues but instead discussed social and personal issues.

Delcourt met with Dubin on November 14, 2008, to discuss her observations of his teaching. She did not provide him with any written concerns at that time. That same day, Delcourt provided input and fully approved Dubin's self-assessment, noting Dubin's strengths in relating to students and preparing them to transfer to four year institutions, as well as his ability to grow the number of students desiring to take a class. Though his self-assessment was approved, Delcourt recommended later that same month that Dubin's contract to teach at Madison College not be renewed. While student assessments are a consideration in the probationary faculty review, Delcourt did not consider student class surveys in reaching her recommendation.

Out of eighteen full-time probationary instructors, Dubin was the only one whose contract was not renewed. The non-renewal of Dubin's contract was the only non-renewal since 2000.

In November 2008, Delcourt informed Madison College's Director of Human Resources, Gwen Torkelson, that she had decided not to renew Dubin's contract and provided her with an office file on Dubin.[2] This is the only employee that Delcourt has ever recommended for non-renewal. Delcourt contacted Torkelson to insure proper procedures were followed in issuing the non-renewal. Torkelson accepted Delcourt's

---

[2] Torkelson is also Delcourt's sister-in-law.

decision and relied on the information she provided before preparing and signing Madison College's preliminary letter of non-renewal for Dubin, which she dated January 27, 2009.

Delcourt and Torkelson met with Dubin on January 27, 2009, to hand-deliver the non-renewal letter.   The letter informed Dubin that the administration was recommending to the Board that his contract not be renewed for four reasons: (1) concerns with content delivery, preparation and classroom management; (2) communication issues with students; (3) unreliable attendance; and (4) a lack of cooperation and collaboration with colleagues, staff and administrators.  The letter also served as notification to Dubin of his "right to a private conference with the Board relative to the subject of the nonrenewal of your contract." (Defs.' PFOF (dkt. #47) ¶74.)

At the meeting, Dubin signed the letter acknowledging his receipt.  Two days later, Dubin sent Torkelson a letter stating, "I hereby request a private hearing with the District Board as provided for in Section 118.22(4) of the Wisconsin Statutes." (*Id.* ¶75.)  That same day, Dubin, his union representative and Torkelson entered into an agreement that Dubin would be brought before the Board in May.

During the spring of 2009, Delcourt told Brenda Thomas, a sociology instructor at Madison College, that she should distance herself from Dubin because he was a troublemaker that involved his lawyer in his teaching profession.[3]   During that same

---

[3] The following school year, after Dubin was no longer teaching at Madison College, Delcourt told Thomas that she considered Dubin a "problem," a "pain in the ass" and an "asshole." (Pl.'s Additional PFOF (dkt. #64) ¶98.)

semester, Delcourt met with two students about her decision not to renew Dubin's contract. One student, Michele Balesteri, who had done very well in Dubin's course, sent a letter to Delcourt and Madison College's president expressing disappointment in the decision not to renew his contract. At the meeting, Delcourt explained that the decision did not have to do with Dubin's teaching, but with "administrative reasons."

## VII. The May 20, 2009 Hearing

In late April 2009, Dubin met with Terrance Webb, Madison College's Vice President for Learner Success, about the non-renewal decision. At their meeting, Webb told Dubin that the Board had been advised at some time in the past of his complaints of discrimination at Madison College, as well as of his attorney's March 2006 letter. Webb said he would speak with Delcourt about her recommendation.

On May 5, 2009, the Board's attorney, Jon Anderson, wrote a letter to Timothy Hawks, the union counsel representing Dubin, and Thomas Godar, the counsel representing Madison College's administration, which explained the procedures for a May 20th hearing before the Board.[4] The procedures provided the administration 45 minutes to present support for its recommendation of non-renewal and Dubin or his representatives 45 minutes to respond. While either party could present any relevant information at the hearing, including documents, it was not an evidentiary hearing where witnesses could testify.

---

[4] Although plaintiff disputes even referring to the Board meeting on May 20th as a hearing, it is not the label but the content of the meeting that is important. Therefore, the court will refer to the meeting as a hearing, subject to the specific explanation of what procedures were used.

A week later, union attorney Hawks sent a letter to board attorney Anderson requesting the hearing be open to the public.   On May 14th, Anderson replied to Hawks's letter, explaining that an open hearing was not necessary under the law and that the hearing would proceed as outlined in her May 5th letter.   The following day, the College's Human Resource Manger Torkelson received the EEOC charge Dubin had filed against Madison College.   Torkelson emailed a copy of the charge to Anderson.   While Dubin wanted to attend the hearing, his attorneys counseled him not to do so.   Two days before the hearing, Hawks informed Anderson by letter that both Dubin's personal counsel and he would not participate in the hearing.

The Board met as scheduled on May 20, and Board members Jan Bultema, Jon Bales, James Cavanaugh, Frances Huntley-Cooper, Josephine Oyama-Miller, Vera Riley and Carolyn Stoner were in attendance, while two additional members were absent. Board attorney Anderson also attended the hearings, as did Madison College President Bettsey Barhorst, Vice-President Webb, Human Resource Manager Torkelson, Dean Delcourt and Ellen Hustad, the Board's recording secretary.   Anderson informed the Board of Hawk's May 18th letter, explaining that Dubin's attorney and he would not attend.   The Board nevertheless waited fifteen minutes to see if Dubin or any of his representatives would attend.   When no one arrived, the Board began its meeting at 5:19 p.m. and immediately moved into executive session to conduct a private conference regarding Dubin's non-renewal.

At the hearing, it was Torkelson who was responsible for presenting the administration's case for non-renewal.   Torkelson distributed several documents to the

Board that she had prepared with the assistance of the administration's attorney.   As with the January non-renewal letter, Delcourt had been involved in obtaining the pertinent information, although Torkelson produced many of the documents.   The documents provided information to support the non-renewal.   The documents did not mention Dubin's religion, his attorney's 2006 letter alleging race discrimination, or any of his internal complaints about religious discrimination or harassment by co-workers. Torkelson reviewed the documents with the Board and answered questions they had about the non-renewal.   Delcourt did not participate in the hearing except to answer a question about Dubin's employment with Edgewood College.   Dubin's religion and his complaints of discrimination were not mentioned at the hearing.

Prior to the hearing, none of the Board members knew anything about Dubin.[5] Looking back, none of the Board members could recall being informed of Dubin's EEOC complaint, a copy of which Torkelson had forwarded to the Board's recording secretary five days before the hearing.   After receiving the information provided by Torkelson and asking some clarifying questions, the Board entered a closed session at 5:50 p.m. to

---

[5] Although Dubin proposes facts about the Board members having previously been apprised of his complaints of discrimination, he additionally proposes several facts about Board members having no knowledge about him before the hearing.   (*See, e.g.*, Pl.'s Additional PFOF (dkt. #64) ¶253 ("Prior to May 20, 2009, Bultema knew nothing about Dubin[.]"); ¶274 ("Prior to the May 20th meeting, Ms. Oyama-Miller heard from attorney Jon Anderson there was a nonrenewal contract and it was going to be a closed session meeting, but she never heard anything else about Dubin -- she never met him, sat in on his classes, reviewed his personnel file or ever talked to his colleagues or students."); ¶280 ("Prior to May 20, 2009, Frances Huntley-Cooper did not know of Dubin . . . or anything about him.").)   It is an awkward situation where a party contradicts its own proposed facts; however, drawing the inference in favor of plaintiff, it is possible that the Board was previously made aware of Dubin's complaints of discrimination, but they were not aware that it was Dubin who made the complaints.

deliberate.  The members of the administration in attendance were asked to leave while the Board and attorney Anderson conferred about the recommendation of non-renewal.

During deliberations nothing was mentioned about Dubin's religion or any of his discrimination complaints.  Based solely on the information provided at the hearing, the Board voted unanimously to approve the administration's recommendation that Dubin's teaching contract not be renewed.[6]  The Board's May 26, 2009 letter informing Dubin of its decision to accept the administrations recommendation noted no reasons for not renewing Dubin's teaching contract other than the four provided in the original non-renewal letter issued to Dubin in January.


OPINION

At summary judgment, plaintiff must "show through specific evidence that a triable issue of fact remains on issues for which [he] bears the burden of proof at trial[;] the evidence submitted in support of [his] position must be sufficiently strong that a jury could reasonably find for [him]."  *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) (internal quotation omitted).  "In resolving a summary judgment motion, [the court] draw[s] all reasonable inferences and resolve[s] factual disputes in favor of the non-moving party."  *Id.* at 462 (citation omitted).

---

[6] When asked about the non-renewal decision after the fact, several Board Members, including Bultema, Cavanaugh and Stoner, noted that had the administration recommended renewing Dubin's contract they would have had no objection.  In fact, during her time on the Board, member Huntley-Cooper could not recall any time when the Board disagreed with the administration's recommendation.

Plaintiff has brought two claims under Title VII against defendants.  First, he contends that defendants' decision not to renew his teaching contract in the spring of 2009 was the result of discrimination against him for being Jewish.  Second, he contends his non-renewal was a result of retaliation against him for having spoken out against racial and religious discrimination in the past.  When pursuing a discrimination or retaliation claim under Title VII, a plaintiff may proceed under the direct or indirect method.  *Silverman v. Bd. of Educ. of City of Chicago*, No. 10-2977, 2011 WL 941518, at *2 and *8 (7th Cir. Mar. 21, 2011).  An important difference between the two methods is that if a plaintiff provides evidence that points directly to a discriminatory reason for the employer's action under the direct method, "the defendant's summary judgment motion necessarily must fail, in contrast to the burden-shifting approach of the indirect *McDonnell* Douglas method."  *Id.* at *3 n.3.

Although plaintiff contends that there is sufficient evidence to defeat defendants' motion under "*either* the 'direct' or 'indirect' method," *see* Pl.'s Br. in Opp'n (dkt. #67) at 4, plaintiff focuses and argues only under the direct method.  *Id.* at 6 ("Dubin proceeds here under the direct method of proof.").  The court will follow suit and address only whether plaintiffs' claims survive under this method.[7]  Under the direct method,

---

[7] On summary judgment, it is not the responsibility of the court to make or develop arguments for the parties.  *Costello v. Grundon*, 625 F.3d 342, 367 n.10 (7th Cir. 2010) (citing *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999)); *see also Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704-05 (7th Cir. 2010) ("We will not hunt through the record to find this 'wealth' of evidence.'" (citation omitted); *Compania Administradora de Recuperacion de Activos Administradora de Fonos de Inversion Sociedad Anonima v. Titan Int'l Inc.*, 533 F.3d 555, 562 (7th Cir. 2008) ("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that creates a genuine issue of material fact for trial.").

plaintiff's retaliation claim survives summary judgment, but his religious discrimination claim does not.

## I. Claims Against Defendants Directly

A. Religious Discrimination

"To avoid summary judgment under the direct approach, the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision." *Silverman*, 2011 WL 941518, at *2. Though plaintiff does not concede the point, his proposed findings of fact or his brief opposing defendants' summary judgment motion establish that his claims against defendants are based on vicarious liability. Simply put, there is no direct evidence from which a reasonable jury could find that the Board's decision to not renew plaintiff's teaching contract was the result of intentional, religious discrimination.

Plaintiff can, of course, survive summary judgment on his religious discrimination claim under the direct method using circumstantial evidence. *Id.* When an employee seeks to prove his discrimination claim by circumstantial evidence, at least three types are available:

(1)    "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected

---

Although plaintiff discusses an element that is relevant to the indirect method -- whether defendants' reasons for non-renewal were merely pretextual -- that element is also relevant to proceeding under the direct method. *Silverman*, 2011 WL 941518, at *3. Further, the court finds it telling that no-where in plaintiff's opposition brief does he mention the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which sets forth the applicable framework for proof by the indirect method.

group, and other bits and pieces from which an inference of discriminatory intent might be drawn[;]"

(2)    "evidence showing that the employer systematically treated other, similarly situated [non-Jewish] employees better[;]" and

(3)    "evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual."

*Id.* (internal citations omitted). When the Board's actions are examined here, however, there is insufficient evidence to create "a convincing mosaic of circumstantial evidence" from which a reasonable jury could infer intentional discrimination.

To start with, there is no admissible evidence to support even a reasonable inference that the Board was aware of plaintiff's Jewish faith. Instead, all the evidence -- most of which was provided by plaintiff -- points to the fact that the Board did not even know who plaintiff was until the May 20, 2009 hearing, let alone that he was of Jewish faith. Additionally, there is no dispute that plaintiff's religion was never mentioned during the meeting, nor during the Board's deliberation. In other words, the record is devoid of any "ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* at *3.

Plaintiff does provide proposed facts about the Board "possibly" having been made aware of his May 2009 EEOC complaint, which would have mentioned plaintiff's religion. No reasonable jury, however, could infer that the Board was actually aware of the complaint, because the undisputed facts support the opposite conclusion. All the testimony from Board members, as well as documentary evidence from the May 20, 2009 hearing, support the conclusion that (1) members knew about Dubin only from

information provided at the hearing and (2) no information about any of his complaints, including his most recent EEOC complaint, was provided.  Finding the Board was aware of plaintiff's religion would, therefore, require pure speculation, which is insufficient to withstand summary judgment.  *Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008).

There is one additional piece of evidence relevant to the religious discrimination claim and that is the statement from Terrance Webb that at some earlier time the Board had been made aware of plaintiff's earlier complaints.  Plaintiff's complaints in 2006, however, concerned alleged reverse, racial discrimination with regard to a teaching position -- the instructor hired instead of Dubin being black – and, thus, had nothing to do with plaintiff's religion.  Additionally, there is no evidence the Board was even aware of the *contents* of that or any other complaint.

Even assuming the Board had been informed of details of racial or religious complaints when they were made, there is no evidence from which to infer that members of the Board had any awareness at the time of the May 2009 hearing.  The most recent of plaintiff's reported complaints about religious harassment from co-workers had occurred almost two years before that hearing.  "When an employee's protected conduct is separated by a significant period of time from the adverse employment action, the proximity of the incidents does not support a causal connection between them." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011).  Here, the timing of plaintiff's discharge is simply too far removed from his past allegations of religious harassment for a reasonable jury to impute knowledge of his religion to members of the

Board.  *Cf. Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) ("The six-month lag between Leonard's April 2005 complaint to the civil rights office and his October 2005 unsuccessful interview is too long to infer a link between the two.").

There also is no evidence of either of the other, two recognized types of circumstantial evidence.  Plaintiff provides no information about the religious affiliations of other instructors.  At a minimum, such information would be necessary to establish that similarly-situated, non-Jewish instructors were systematically treated differently by the Board.   Indeed, the uncontradicted evidence is to the contrary:   the Board consistently accepted the administration's renewal recommendations regardless of religion.  Finally, plaintiff has provided no evidence that *the Board's* reasons for not renewing plaintiff's teaching contract were pretextual.  Although plaintiff has put forward vast amounts of evidence to show that *Delcourt's* recommendation of non-renewal was pretextual, there is no evidence the Board did not honestly believe plaintiff had communication issues with students, faculty and staff, as well as unreliable attendance or sub-par content, delivery, preparation and classroom management.   As the Seventh Circuit has explained, "[a] pretext . . . is a deliberate falsehood . . . [a]n honest mistake, however dumb, is not[.]"  *Forrester v. Rauland-Bord Corp*, 453 F.3d 416, 418 (7th Cir. 2006) (internal citations omitted).  Although plaintiff has challenged the accuracy of the truthfulness of information provided the Board, he has not disputed that the Board was unaware that any of the information before it was inaccurate.

B. Retaliation

Plaintiff's retaliation claim as directly asserted against defendants also fails because there is no evidence to support a causal link between the non-renewal and his complaints of discrimination.  At most, the evidence supports a finding that the Board was aware of Dubin having made complaints a year to two years before the non-renewal decision was made.  There is no other evidence of the Board mentioning any of those complaints, much less reviewing those complaints at the hearing.  The mere fact that the non-renewal came after the complaints is insufficient by itself to establish a causal link. *Silverman*, 2011 WL 941518, at *9.  And that is all the evidence plaintiff has provided here.

## II.  Claims that Defendants are Vicariously Liable for Discrimination

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court held that "in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority."  *Id.* at 802.  Employer vicarious liability under Title VII is often referred to as "the cat's paw" theory.  *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011).  In general terms, the theory applies when an employment decision is made by an unbiased individual but that decision is causally linked to the influence of the impermissible bias of a non-decisionmaking, co-worker; the unbiased decisionmaker merely acting as the biased non-decisionmaker's "cat's paw."  *Id.* at 379.

Understandably, deciding exactly what degree of influence the non-decisionmaker needed to have in the decision making process to find the actual decisionmaker liable was not easy. *Id.* Courts -- sometime even the same court -- used differing standards, with some applying the more demanding "singular influence" standard and others requiring a lesser degree of influence to impute liability on an employer. *Id.* at 379-80 (citing cases in the Seventh Circuit using differing standards).

In *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191 (2011) -- a case involving the Uniformed Services Employment and Reemployment Rights Act -- the Supreme Court offered guidance, addressing the circumstances under which an employer may be held liable based on the discriminatory intent of employees who influence, but do not actually make, the ultimate employment decision.[8]   Like Title VII, an employer violates the USERRA if the employee can establish that discrimination because of an employee's military service was *a motivating factor* in an adverse action taken against the employee. *Id.* at 1190.[9]   The Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194.   Based on that holding, the Court

---

[8] Defendants filed a letter informing the court about the Supreme Court's decision in *Staub,* because the decision was issued while defendants' summary judgment motion was pending.  (Dkt. #77.)  Defendants explained why they thought *Staub* had no impact on their motion.  Plaintiff responded to defendants' letter with a motion for leave to file a response, attaching his response as an exhibit to that motion.  (Dkt. #78.)  The court will grant plaintiff's motion and has considered the response, as well as defendants' letter, in reaching this decision.

[9] The Supreme Court specifically noted that the USERRA is "very similar to Title VII[.]" *Staub*, 131 S. Ct. at 1191.

reversed the appellate court's decision and remanded the case because it was clear that two supervisors "were acting within the scope of their employment when they took the actions that allegedly caused [their supervisor] to fire [the plaintiff]." *Id.*

Here, there is no disputing that Delcourt was defendants' agent within the meaning of Title VII, as well as plaintiff's supervisor. Delcourt was Madison College's Dean of Arts and Science and plaintiff's ultimate supervisor. All the record evidence points to Delcourt's non-renewal recommendation as being a "proximate cause" of the ultimate employment action (the Board's non-renewal of plaintiff's teaching contract). Delcourt drafted the preliminary non-renewal letter issued to plaintiff and her reasons for nonrenewal contained in the letter were adopted verbatim by the Board as its own. Additionally, it is undisputed that the Board relied solely on the information provided at the May 20, 2009 hearing in reaching its determination not to renew plaintiff's contract.[10] The deposition testimony from the Board members provides additional support for the conclusion that they had no reason not to affirm the administration's, here effectively Delcourt's, reasons for non-renewal. Thus, they accepted that information as true. Defendants can point to no other evidence or information considered by the Board. Not only would it be reasonable for a jury to find that Delcourt's recommendation was *a* proximate cause of the nonrenewal; it would be reasonable to find that her recommendation was *the* cause of that decision. Therefore, the issue is whether a reasonable jury could find that Delcourt intended an adverse employment action was because of either discriminatory or retaliatory animus.

---

[10] Although Torkelson represented the administration at the hearing, Delcourt had obtained and organized much of the information provided there.

A.  <u>Religious Discrimination</u>

Unlike the Board, there is no doubt that Delcourt was aware of plaintiff's religion. Specifically, plaintiff had complained to Delcourt multiple times about being harassed by other instructors because he was Jewish.   However, similar to plaintiff's direct discrimination claim against defendants, he fails to provide facts that create a convincing mosaic of circumstantial evidence from which a reasonable jury could infer that Delcourt intentionally discriminated against plaintiff because of his religion.

Plaintiff provides no evidence that Delcourt ever made any anti-Semitic comments or even responded harshly when discussing plaintiff's religion.  Nor is there evidence of systematic, better treatment of non-Jewish instructors.  Indeed, there is no evidence regarding the religion of any instructors similarly-situated to plaintiff.  Finally, although the reasons offered by Delcourt for recommending non-renewal may have been trumped up to retaliate against plaintiff, there is no evidence to suggest that they are a pretext to cover-up *religious discrimination* by Delcourt.  In other words, there is no evidence that would create a genuine issue of material fact about whether Delcourt's recommendation was motivated by an animus toward plaintiff because of his religion.

On the contrary, *all* of the problematic statements plaintiff attributes to Delcourt reference her anger or animus toward him because of his *complaints* about discrimination. (*See, e.g.*, Pl.'s Additional PFOF (dkt. #64) ¶¶61-62 ("Delcourt then told Dubin[ ] that his 'lawyer's letter' will follow him around for the rest of his career at MATC." "Delcourt asked him (rhetorically)[,] 'You don't really think that they are going to let you stay here, do you?'") and ¶77 ("Delcourt was upset with Dubin for complaining [about Stevens's

anti-Semitism], abruptly told him that he had not passed probation, and told him, once again, that 'they' were not going to let him stay at MATC in light of his complaints of discrimination and that his complaints of discrimination would be 'detrimental to his longevity' at MATC.".)   There is *no* evidence from which a jury could find that a religiously-based discriminatory motive played a role in Delcourt's recommendation to non-renew plaintiff's teaching contract.   Accordingly, defendants will be granted summary judgment on plaintiff's Title VII religious discrimination claim.

## B.  Retaliation

"To avoid summary judgment under the direct method of proof for proving retaliation, a plaintiff must show: (1) that [he] engaged in a statutorily protected activity; (2) that [he] suffered a materially adverse action by h[is] employer; and (3) there was a causal link between the two."  *Silverman*, 2011 WL 941518, at *9.  There is no dispute that plaintiff's complaints about racial and religious discrimination are protected activities.  Also, there is no dispute that the decision to not renew plaintiff's teaching contract was effectively a discharge and, thus, a materially adverse action.  The issue is whether there is sufficient evidence of a causal link between the two to permit a reasonable jury to find in favor of plaintiff.

To satisfy his burden on summary judgment, plaintiff needs to provide "evidence that reasonably suggests that h[is] protected speech activities were related to h[is] employer's [retaliation]."  *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007) (quotation omitted).  In *Lewis*, the plaintiff proposed facts suggesting her complaints of

26

alleged sex discrimination resulted in her being singled out for (1) new, dangerous assignments and (2) adverse treatment about her job performance. *Id.* at 655. The Seventh Circuit held that plaintiff's Title VII retaliation claim survived summary judgment because of these active changes at the hands of her supervisor after her complaints. *Id.* at 655-56.

Here, plaintiff submits evidence of more substantial changes, as well as differential treatment, than the Seventh Circuit found sufficient to withstand summary judgment in *Lewis*. Although neither Dubin nor his representatives attended the May 20, 2009 hearing, he challenges the accuracy, as well as the strength of those reasons for non-renewal, in this lawsuit.[11] And it is the facts he proposes about the inaccuracy of the reasons for his non-renewal in addition to statements attributed to Delcourt that defeat defendants' motion for summary judgment on his retaliation claim.

One of the four reasons provided for non-renewal was unreliable attendance. Before the non-renewal letter, Dubin was never informed that his attendance was an issue. Also, the collective bargaining agreement governing Dubin's employment entitled him to sixteen days of leave a year and during the fall 2008 semester he only missed

---

[11] The court is deeply troubled by plaintiff's failure to attend the hearing regarding the renewal of his teaching contract. His failure to attend denied the Board an opportunity or any reason to look behind the facts provided by the administration. Defendants, however, fail to provide a legal basis to bar plaintiff from challenging in this court the Board's cited reasons for non-renewal, despite failing to do so before the Board itself. Indeed, the law appears to support the conclusion that once plaintiff's contract was not renewed, defendants lost this mitigation defense. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808 (1998) ("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.").

seven and a half days.  In August 2008, he was informed that he had 41.47 sick days available for use.  Another full-time probationary employee, Cherif Corrrea, missed twelve days during the same period, but was not disciplined.  Neither Delcourt nor Torkelson questioned Dubin's truthfulness about why he was taking leave.  Also, the absence charts provided to the Board contained some errors showing that Dubin was absent several days when he had not actually been absent.  During spring 2009, it is also undisputed that Dubin improved his attendance.  Although several students complained about Dubin arriving late to class, none of the complaints addressed absences or canceled classes.

As far as cooperation and collaboration with colleagues and staff, Delcourt never specified what Dubin's problems in these areas were.  Dubin did fail to respond to an administrative email to schedule an in-class observation, but he responded to the email once Delcourt spoke with him about this failure.  Other probationary instructors, such as Cherif Correa, responded late to the same administrative email and were not disciplined.

Regarding communication issues with students, although Delcourt had received individual complaints from several students, she did not consider any of the larger survey results from students taking classes with Dubin.  Also, Delcourt did not inform the Board that the student who complained about Dubin in the spring of 2008 later sent her a letter praising Dubin's teaching.

Finally, Dubin points out that typically when the administration found issues with an instructor, the instructor was given an opportunity to remedy the issues and once remedied, the issue would not be held against the instructor.  Dubin did not receive that

typical treatment.  Although he remedied many, if not all, of the issues Delcourt raised during the course of her evaluation of him, those same issues were used in the non-renewal of his teaching contract.  On top of these facts is the undisputed fact that until Dubin's nonrenewal recommendation, Delcourt had never issued such a recommendation.  Indeed, since 2000, Dubin was the *only* full-time, probationary employee not renewed, as well as the *only* employee to complain about discrimination.

While a jury may find otherwise, this evidence at a minimum reasonably suggests that Delcourt retaliated against plaintiff because of his complaints of discrimination. Accordingly, defendants are not entitled to summary judgment on plaintiff's cats' paw retaliation claim.

ORDER

IT IS ORDERED that:

(1)   Plaintiff Michael Dubin's motion for leave to file a response to defendants' letter (dkt. #78) is GRANTED.

(2)   The motion for summary judgment filed by defendants Board of Madison Area Technical College District and Madison Area Technical College-Madison (dkt. #45) is DENIED with respect to plaintiff's "cat's paw" Title VII retaliation claim and GRANTED in all other respects.

Entered this 26th day of April, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge