UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DR. MICHAEL J. DUBIN,

                 Plaintiff,        Case No. 10-CV-035-WMC

     vs.

BOARD OF MADISON AREA TECHNICAL
COLLEGE DISTRICT and MADISON AREA    Madison, Wisconsin
TECHNICAL COLLEGE - MADISON         May 2, 2011
                             1:50 p.m.
              Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT EXCERPT FROM
FIRST DAY OF JURY TRIAL - AFTERNOON SESSION
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiff:   FOX & FOX, S.C.
                    BY:  RANDALL B. GOLD
                       MICHAEL R. FOX
                   124 West Broadway
                   Monona, Wisconsin  53716

For the Defendants:  GODFREY & KAHN, S.C.
                    BY:  MICHAEL D. HUITINK
                       THOMAS G. O'DAY
                       NELSON W. PHILLIPS
                   780 North Water Street
                   Milwaukee, Wisconsin  53202-3590

Also Present:       Terrance Webb, MATC

CHERYL A. SEEMAN, RMR, CRR
Official Court Reporter
United States District Court
120 North Henry Street
Madison, Wisconsin  53703
1-608-255-3821

1                                    * * *

2          MR. FOX:  We call Dean Delcourt adversely.

3          THE COURT:  Thank you.  Could we arrange

4    to -- thank you.  For the jury's benefit, witnesses

5    are not allowed to sit in the courtroom until after

6    they have testified, so that's why we have this brief

7    delay between calling witnesses.

8          Ms. Delcourt, you can come straight forward.  And

9    just come forward.  And, if you would, raise your

10   right hand and be sworn by the clerk.  You may then

11   step around and be seated.

12         THE WITNESS:  Thank you.

13   **VERONICA DELCOURT, PLAINTIFF'S WITNESS, SWORN**

14         THE COURT:  Thank you.  You may proceed,

15   counsel.

16                   <u>ADVERSE EXAMINATION</u>

17   BY MR. FOX:

18   Q.   Please state your name for the record, please.

19   A.   Veronica Ann Delcourt.

20   Q.   And how are you currently employed?

21   A.   I'm not employed right now.

22   Q.   And you were employed while Michael Dubin was a

23   probationary faculty member in the History Department

24   at MATC; is that correct?

25   A.   Yes, I was employed then.

                     VERONICA DELCOURT - ADVERSE

1  Q.    And you are the person who recommended that he

2  not be renewed for his contract in the spring of 2009;

3  is that correct?

4  A.    Correct.

5  Q.    And you were required, as part of the rules that

6  apply to such a nonrenewal, to give a preliminary

7  notice of the non-renewal listing, the specific

8  reasons that you were advancing to support the

9  nonrenewal, correct?

10          MR. PHILLIPS:  Objection.

11          THE COURT:  Foundation?

12          MR. PHILLIPS:  Foundation.

13          THE COURT:  You can testify as to what your

14  obligations were.

15  A.    My obligations were to let him know by a certain

16  deadline, prior to the end of his contract, about the

17  nonrenewal.

18  Q.    And in fact you were also aware that it was your

19  obligation that after you "let him know," as you call

20  it, "by the end of his contract" what the reasons were

21  that you were recommending that he no longer be

22  retained at the school that he was to be given a

23  chance to remedy whatever it is you found flawed in

24  his teaching at that point in time, correct?

25  A.    Correct.

1  Q.    And I'm going to show you, and it may be on your

2  screen already -- is there a document on your screen?

3  A.    Yes.

4  Q.    -- it's Exhibit 14 in this matter and it's a

5  January 27th letter addressed to Mr. Dubin and it's

6  addressed, it's signed actually, by Ms. Torkelson; do

7  you see that?

8  A.    I do.

9  Q.    And Ms. Torkelson was your sister-in-law?

10 A.    Not at the time.

11 Q.    Okay.  She is now?

12 A.    Yes.

13 Q.    Okay.  And as I understand it, she -- the process

14 that you followed was you gave her the information,

15 which she then put in the letter, informing Dr. Dubin

16 of the reasons that you had to recommend that he not

17 be continued anymore as a teacher at MATC; is that

18 correct?

19 A.    That's correct.

20 Q.    Now, you see that document is dated on the 27th

21 of January of 2009.  So given what you previously

22 testified to, Dr. Dubin was supposed to have until the

23 end of that semester to address the concerns you

24 raised in your letter, correct?

25 A.    That's correct.

1  Q.    And in fact if he showed improvements with regard

2  to those concerns, he could turn around the decision

3  to release the recommendation that you had to nonrenew

4  him, correct?

5  A.    That is correct.

6  Q.    And that was part of the rules of supervision at

7  MATC as you understood them, wasn't it?

8  A.    That is correct.

9  Q.    If somebody in fact remediated a perceived flaw

10  in their performance as a probationary faculty member,

11  that was not to be used to support a non-renewal

12  decision under the protocols then in existence at

13  MATC; is that correct?

14  A.    That's correct.

15  Q.    Okay.  And the incidents that you were to use, if

16  you used them, to support a nonrenewal were to be

17  those that were unremediated, right?

18  A.    I'm not sure I understand what you mean.

19  Q.    In other words, issues that you were going to go

20  to the Board and ask them to fire him over were issues

21  that he hadn't corrected, right; wasn't that the

22  protocol then in existence at MATC?

23  A.    Correct.

24          MR. PHILLIPS:  Objection as to foundation.

25          MR. FOX:  She can answer on the basis of her

VERONICA DELCOURT - ADVERSE

1  knowledge.

2       THE COURT:  Yeah.  It might make sense for

3  you to lay a foundation for this witness generally,

4  but I will overrule the objection.  You should testify

5  as to your own personal knowledge.

6  A.   Based -- the nonrenewal that we brought to the

7  Board -- well, could you just repeat the question

8  again?

9  Q.   In the rules that existed at the time that you

10  were acting as the supervisor of Mr. Dubin, was your

11  understanding that if something was remediated -- in

12  other words, a flaw or a concern was remediated -- by

13  the person that you were supervising, it was not to be

14  used against them later for a nonrenewal, correct?

15  A.   Correct.

16  Q.   Now, prior to coming here today, you have given

17  testimony in this matter before, have you not?

18  A.   Yes, I have.

19  Q.   And in fact you gave testimony on two occasions

20  at some length, didn't you?

21  A.   Yes, I did.

22  Q.   And prior to giving that testimony, you were

23  aware that Dr. Dubin was challenging your

24  recommendation not to renew him for his faculty

25  position, correct?

VERONICA DELCOURT - ADVERSE

 1  A.    Correct.

 2  Q.    And prior to testifying in those depositions, you

 3  had the access to various lawyers that represented

 4  MATC, did you not?

 5  A.    I did.

 6  Q.    And those lawyers were able to prepare you for

 7  the depositions that you were going to take to let you

 8  know what was going on?

 9  A.    They did.

10  Q.    And that was not only true before the first

11  deposition, but it was true before your second

12  deposition; isn't that right?

13  A.    That is correct.

14  Q.    And in fact, and you can tell me if you recall

15  this, your first deposition was on September 22nd of

16  2010 and your second deposition was on October 28th of

17  2010?

18  A.    Correct.

19  Q.    And so you had over a month between the first

20  deposition when all of this material was being

21  inquired into before you took a second deposition

22  addressing much of the same subject matter, correct?

23  A.    Correct.

24  Q.    So you had a chance to think about --

25             THE COURT:  Counsel, I think we get the

VERONICA DELCOURT - ADVERSE

1   point.

2           MR. FOX:  Well, this is important.

3           THE COURT:  It is important and you have made

4   your point, counsel.

5           MR. FOX:  Okay.  Now you threw me off, Judge.

6           THE COURT:  I apologize for that.

7           MR. FOX:  No.  It's my own fault.

8   BY MR. FOX:

9   Q.   Do you recall that in the depositions you were

10  asked, with regard to the January notice that is on

11  the screen in front of you, which of those issues

12  Dr. Dubin had remediated after you gave him that

13  notice; do you recall that?

14  A.   I'm sorry.  I kind of missed the first part of

15  your question.

16  Q.   When you were under oath in the depositions --

17  A.   Yes.

18  Q.   -- do you recall being asked which of those

19  issues Dr. Dubin had remedied or remediated so they

20  would fall into that category of nonissues?

21  A.   I do remember us talking about these issues.

22  Q.   Right.  And you testified, did you not, that the

23  only issues you could recall that he had not

24  remediated by the end of the semester were the issues

25  that you identified as the -- what would be the third

                VERONICA DELCOURT - ADVERSE

1   bullet point, unreliable attendance, correct?

2   A.   I don't really remember exactly what I discussed

3   and finished with the remediation.   In terms of these

4   four --

5           MR. FOX:   I would ask that she not offer

6   testimony.

7           THE COURT:   That's fine.   You should just

8   wait until he asks the question.   You are doing a very

9   good job of answering the question that's asked.   Just

10  continue to do that.

11          THE WITNESS:   Thank you.

12          MR. FOX:   May I approach the witness, Your

13  Honor?

14          THE COURT:   You may.   Is it possible for you

15  to leave a copy of the deposition transcripts with the

16  witnesses rather than go back and forth?

17          MR. FOX:   I could do that, sure.

18          THE COURT:   Thank you.   And at this time,

19  counsel, I take it, you simply want to refresh the

20  witness's recollection --

21          MR. FOX:   Yes.

22          THE COURT:   -- as to what she testified?

23  Then you may do so.

24  BY MR. FOX:

25  Q.   I'm trying to find the page for you here.

VERONICA DELCOURT - ADVERSE

1   A.    Okay.

2            MR. FOX:  Your Honor, excuse me a minute.

3            THE COURT:  Why don't you leave it and then

4   you can just refer to it.

5            MR. FOX:  I want to make sure the same lines

6   are on this.  It looks as if my copies have different

7   lines on it, so I want to make sure I have the

8   accurate thing.

9            THE COURT:  That's fine, counsel.  Just move

10  it along.

11           MR. FOX:  Sorry.  It's my fault.

12  BY MR. FOX:

13  Q.    I'm going to direct your attention, and I will

14  leave this deposition with you, to page 421 of the

15  deposition.

16  A.    Okay.

17  Q.    And I want you actually to go to the bottom of

18  421 to line 19 and if you can read through line 19,

19  read through the next page of 422.

20  A.    To what line on 422?

21  Q.    Read the entire page of 422.

22           MR. PHILLIPS:  Your Honor, I would object.

23           THE COURT:  I think at this point he is

24  asking her to refresh her recollection.  There has got

25  to be a faster way to do it, but I will indulge you

VERONICA DELCOURT - ADVERSE

1   for a moment.  Does either counsel have a copy of the

2   deposition transcripts?  I wasn't provided with a

3   copy.

4           MR. FOX:  The fastest way to do it is I --

5           THE COURT:  There are a lot of fast ways to

6   do it; this isn't one of them, but I'm letting you do

7   it.  Have you finished your review of that page?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Then would you please pose a

10  question, counsel?

11  BY MR. FOX:

12  Q.   Okay.  Do you recall being asked whether or not

13  you contended that Mr. Dubin had not remediated any of

14  the issues that were brought to your attention in the

15  January letter that's marked Exhibit 14?

16  A.   I do remember us talking about this.

17  Q.   Okay.  And wasn't it true, you were asked the

18  question of whether or not he had remediated and the

19  only issues you could identify that he hadn't

20  remediated were an issue with regard to timely

21  submission of grades and an issue with regard to his

22  attendance; isn't that what you identified under oath?

23  A.   At the time, that is what I identified.

24  Q.   And at that time you identified no other issues

25  that he had not remediated other than the attendance

1  and the failure to turn in timely grades, correct --

2  A.    Correct.

3  Q.    -- at that time?  And can you tell me, with

4  regard to attendance, prior to the letter of January

5  27th, had you ever told Mr. Dubin in writing that

6  anything was faulty about his attendance?

7  A.    I do not recall telling him in writing.

8  Q.    Okay.  And prior to January 27th, had you asked

9  him to remediate any part of his attendance?

10  A.    Prior to the 27th, I don't remember doing that.

11  Q.    So when we talk about remediate -- I'm referring

12  to your previous testimony -- remediate means he shows

13  improvement after you call it to his attention,

14  correct?

15  A.    Correct.

16  Q.    Can you tell the ladies and gentlemen of the jury

17  how many days Mr. Dubin missed from the time you gave

18  him the January notice and the time he was out of

19  MATC?

20  A.    I am not completely sure.  I think it was another

21  two days that spring semester.

22  Q.    You don't know whether it was one or two?

23  A.    I believe it was two, but -- I believe it was

24  two.

25  Q.    Did you take time to ascertain exactly whether or

VERONICA DELCOURT - ADVERSE

1  not it showed improvement?

2  A.   Pardon?

3  Q.   Did you take time to determine whether or not his

4  attendance in the spring semester showed improvement

5  over anything that you had criticized him for?

6  A.   What do you mean, at the end of his semester?

7           THE COURT:  From January 27th through May --

8           THE WITNESS:  Through May.

9           THE COURT:   -- did you notice any

10  improvement; did you observe any improvement?

11  BY MR. FOX:

12  Q.   Did you measure that against what you were

13  criticizing?

14  A.   Well, it concerned me that he continued to take

15  time off, especially without coming to let me know

16  what was wrong.  I had no excuses about what might

17  have been the problem, especially when he knew that we

18  were -- that attendance was an issue.

19           MR. FOX:  I'm going to object to that as

20  nonresponsive.

21           THE COURT:  I think it was responsive,

22  counsel.  You should ask your next question.

23           MR. FOX:  Okay.  I will try again.

24  BY MR. FOX:

25  Q.   Did you make any comparison as to the amount of

VERONICA DELCOURT - ADVERSE

1  time he took off in the semester as being greater or

2  less than the time he had taken off, the frequency he

3  had taken off, before?

4  A.   I would say that would have been less time.

5  Q.   Okay.  So he showed some improvement with regard

6  to the frequency that he took off in the spring

7  semester; is that correct?

8  A.   I would say it was less time.  I don't know if

9  that's improvement, but I would say it was less time

10 than he had taken prior to.

11 Q.   Well, if your concern was the amount of days that

12 he had taken off, if that was one of your concerns,

13 then taking off less time would be an improvement,

14 wouldn't it?

15 A.   I would just say it was less time.  It's very

16 difficult to call it *improvement*.  The problem is

17 reliability of attendance to be with students.

18 Q.   In order to really fully evaluate it and to be

19 fully fair, you would want to know why he took

20 whatever time you say he took off in the spring

21 semester.  Why did he take it off?

22 A.   I have no idea.

23 Q.   Did you ever make any effort to determine whether

24 there was sickness or he had health problems that

25 prevented his ability to attend?

VERONICA DELCOURT - ADVERSE

1   A.   I did not.

2   Q.   Did you ever make any attempt to compare his

3   attendance in the spring semester of 2009 to everybody

4   else's who may have been sick or absent for any

5   reason?

6   A.   No, I did not.

7   Q.   Okay.   There were other people who were sick or

8   absent in the spring semester of 2009?

9   A.   I'm sure.

10  Q.   There were -- did you discipline any of those

11  people for their sicknesses or absences?

12  A.   I don't recall that.

13  Q.   Did Dr. Dubin take off any time that he was not

14  allotted under his contract, to your knowledge?

15  A.   No.

16  Q.   Okay.   Now, you said that the only thing, when

17  you were asked that question under oath, the only

18  thing you could remember was the grade problem.   What

19  was the grade problem that Dr. Dubin -- you claim he

20  had when you gave him that notice on January 27th?

21  A.   I'm not really sure I understand what you mean by

22  "grade problem."

23  Q.   Well, didn't you testify under oath in that

24  deposition, and in fact in the pages we have just been

25  referring to, that he didn't get his grades in on

1   time --

2   A.   I see, I see.

3   Q.   -- in the spring of --

4          THE COURT:   I'm sorry, ma'am.  You need to

5   let him finish his questions.  The court reporter is

6   trying to take this down and they can only do it one

7   at a time, so why don't you let him finish his

8   question and then you will have an opportunity to

9   answer.

10  BY MR. FOX:

11  Q.   You appear to remember now.  Did you criticize

12  him for not getting his grades in prior to January

13  27th?

14  A.   I didn't criticize him; I talked to him about it.

15  Q.   Okay.  Isn't it true that the late grades were a

16  fairly widespread problem with many many different

17  faculty members?

18  A.   Missing grades, we -- the college gets a report

19  of the faculty who have not gotten their grades in by

20  a certain deadline.  And so when we get those grade

21  reports, missing grade reports, we contacted faculty

22  to find out if they have already gotten their grades

23  in or did they forget or is there a problem.

24         THE COURT:   The question was, is it a fairly

25  widespread problem at MATC.

VERONICA DELCOURT - ADVERSE

1          THE WITNESS:  Considering 400 faculty

2   members, plus the part-timers, I would say it wasn't

3   widespread, but there are some faculty members who

4   don't get their grades in.

5   BY MR. FOX:

6   Q.   If I could, I will just leave with you Exhibit

7   39.  And if you can take a look at that, could you

8   tell us what that is?

9   A.   This is a missing grades report from the Madison

10  Area Technical College.

11  Q.   And how many pages is that, can you tell?

12  A.   18, 19 -- 23?

13  Q.   And can you eyeball that and just give me a rough

14  estimate or give us a rough estimate of how many

15  faculty are listed on there as having missed grades?

16          MR. PHILLIPS:  Objection, Your Honor.  The

17  document does speak for itself.  If the witness wants

18  to count it --

19          THE COURT:  I will let her eyeball it.  If

20  you are able to give a rough estimate, you may.

21  A.   I would say there are dozens and dozens.

22  Q.   Maybe even hundreds?

23  A.   Maybe.

24  Q.   Okay.  And do you know of any of those

25  individuals who were disciplined in any way at MATC

 1  for their missing grades?

 2  A.   I --

 3           MR. PHILLIPS:   Objection, calls for

 4  speculation.

 5  A.   I wouldn't know.

 6           THE COURT:   I will overrule it.   If you know,

 7  you may answer.

 8  A.   I wouldn't know.

 9  Q.   Okay.   Did you discipline anybody for missing

10  grades?

11  A.   Well, discipline or would I have discussed it

12  with them?   I would have contacted the arts and

13  sciences teachers.

14  Q.   Well, let me define my term *discipline*.   You

15  would agree with me that terminating somebody from

16  their employment is a form of negative action on your

17  part.   Did you take any similar negative action with

18  any other faculty member for missing grades?

19  A.   No, I did not.

20  Q.   Did you take any type of disciplinary action

21  where you took a privilege away or put a letter of

22  warning in a file or said, "You will be in trouble the

23  next time you do it.   I'm putting this in your file,"

24  anything like that?

25  A.   There were no written notices.

                VERONICA DELCOURT - ADVERSE

1   Q.   Okay.  So of all of those, whether it's hundreds

2   or more, there is not even a written notice in their

3   file for missing grades, to your knowledge?

4   A.   Not all of these teachers are arts and sciences

5   teachers, so I can't speak for teachers that came out

6   of other centers, if they had anything written in

7   their files.

8   Q.   I'm just talking about the people to your

9   knowledge.  That's why I ended the question with, "to

10  your knowledge," all of the people that had missed

11  grades that were under your supervision were not given

12  any kind of letter of reprimand or anything of that

13  nature?

14  A.   To my knowledge.

15          THE COURT:  I'm confused now.  Did you

16  provide a letter of reprimand or a specific notice

17  with a failure to provide grades to Mr. Dubin?

18          THE WITNESS:  In a letter that I wrote to

19  Dr. Dubin, I did talk about responding to staff

20  requests, and one of the requests is to get your

21  grades in on time.

22  BY MR. FOX:

23  Q.   Let me clarify that and follow it up because we

24  really want to understand what you are saying.  Did

25  you mention the word *grades* in that letter that you

VERONICA DELCOURT - ADVERSE

1  just identified in response to the judge's question?

2  A.   I would have to see the letter.   I don't recall

3  if the word itself was in the letter.

4  Q.   So as you sit here today, you do not recall

5  whether you mentioned grades to Dr. Dubin in a letter

6  or any kind of written communication in response to

7  his question?

8           MR. PHILLIPS:   Objection, misstates the

9  testimony.

10           THE COURT:   I will sustain the objection.

11  You can rephrase it if you wish.

12  BY MR. FOX:

13  Q.   As you sit here today, you cannot recall any

14  writing to Dr. Dubin specifically mentioning grades?

15  A.   As I sit here at this moment, I cannot recall --

16  Q.   Okay.

17  A.   -- the *grades*, the word *grades*.

18  Q.   Well, we are here to -- you understand though

19  that we are here to find the specific reasons that you

20  recommended to terminate Dr. Dubin; you do understand

21  that?

22  A.   I do.

23  Q.   Okay.   But you did, as you have previously

24  testified -- I want to make sure the two things that

25  you could identify in your deposition were missing

VERONICA DELCOURT - ADVERSE

1  grades for Dr. Dubin and absences that he didn't

2  remediate, right?

3  A.   Yes.

4  Q.   And when were the grades due for the spring

5  semester of 2009 that would have been missing as of

6  the time he had already been terminated?

7  A.   The grades are due a few days after the classes

8  end, so I don't know the specific date.

9  Q.   You don't even know, as you sit here today,

10 whether or not he would have been late with his grades

11 before or after he was terminated, do you?

12 A.   Well, yes, I do.  We were also given a notice

13 that Dr. Dubin hadn't gotten his grades in from the

14 Enrollment Center.  A woman wrote and let us know he

15 finally did go in to meet with her and brought her his

16 grades.

17 Q.   And when did that occur, what date, please?

18 A.   I don't know off the top of my head.

19 Q.   I have to know the date.  Did it occur before or

20 after whatever final decision was made to terminate

21 him?

22        THE COURT:  I think her testimony is she

23 doesn't remember, counsel.

24        MR. FOX:  She doesn't remember.  Okay.  I

25 wasn't sure that she said that.

VERONICA DELCOURT - ADVERSE

1          THE COURT:  That's what her testimony was.

2  BY MR. FOX:

3  Q.   Now, I didn't -- do you recall -- I'm going to

4  show you what has been marked as Exhibit 86 here in

5  this proceeding, which take a look at that and I have

6  a few questions for you about that.

7          THE COURT:  You may pose your question,

8  counsel.

9  BY MR. FOX:

10  Q.   Do you recognize that letter being from a student

11  who initially had a problem with Dr. Dubin?

12  A.   I do.

13  Q.   Can you tell the jury what the date of that

14  letter is?

15  A.   August 24th, 2008.

16  Q.   So on August 24th, 2008, a student who had had a

17  problem earlier that year with Dr. Dubin wrote to you

18  and so that was information that you had with

19  regard -- that at least reflected on Dr. Dubin's

20  attempt to remediate a matter with a student, correct?

21          MR. PHILLIPS:  Objection, foundation.

22          THE COURT:  I will overrule it.  You may

23  answer.

24  A.   Correct.

25  Q.   And in fact that letter indicates that the

VERONICA DELCOURT - ADVERSE

1  remediation embarked on by Dr. Dubin was remarkably

2  successful, wasn't it?

3  A.   Yes, it does.

4       MR. FOX:  Okay.  I would like to show that to

5  the jury, if I could.  She has indicated it's

6  important.

7       THE COURT:  I believe there is no objection.

8       MR. PHILLIPS:  There is none.

9       THE COURT:  And you may.

10      MR. FOX:  Is this visible?

11      THE JURORS:  Yes.

12      THE COURT:  Is there something in particular

13 you are referring the witness to, counsel?

14 BY MR. FOX:

15 Q.   I would like to refer you in this letter -- would

16 you agree with me that the letter explained to you

17 that the problems that she initially had with

18 Dr. Dubin were not only remediated, but he had become

19 her favorite teacher or one of her favorite teachers?

20 A.   Correct.

21 Q.   Now, she had sent you an earlier e-mail earlier

22 than that letter where she indicated to you that she

23 had been troubled by Dr. Dubin being late for his

24 class and she had cried and it seemed she was under a

25 great deal of stress, correct?

VERONICA DELCOURT - ADVERSE

1  A.   Correct.

2  Q.   And students, whether it's the fault of the

3  faculty member or not the fault of the faculty member,

4  are sometimes under stress and don't react very well

5  to a classroom setting; that's not unusual, is it?

6  A.   It happens.

7  Q.   Okay.  And it also happens that as a result of

8  other things in their life, other than the fact that

9  they are having a troubled time with a teacher, that

10  it increases the stress on them, such as health

11  problems, for example?

12  A.   Correct.

13  Q.   You knew that this young lady who wrote this

14  particular letter had health problems, didn't you?

15  A.   Yes, I did.

16  Q.   And that the stress that she was experiencing

17  with Dr. Dubin was complicated by her significant

18  health problems with fibromyalgia, correct?

19  A.   Correct.

20        MR. PHILLIPS:  Objection, completely

21  speculative.

22        THE COURT:  We are asking now about this

23  witness's knowledge and you can answer as to your own

24  understanding.

25  A.   When she came to see me, she did say that.

VERONICA DELCOURT - ADVERSE

1  Q.    Right.  She told you that whatever she was

2  experiencing with Dr. Dubin was also complicated by

3  various health problems she had, including

4  fibromyalgia, right?

5  A.    She told me she had fibromyalgia.  I don't know

6  how it fit into her dealing with Dr. Dubin.

7  Q.    Well, did you not testify that she told you the

8  fibromyalgia added to her stress?

9  A.    She did say that she had fibromyalgia.  If I

10  testified, fine, that it added to her stress, I may

11  have been paraphrasing.

12  Q.    Whether you are paraphrasing or not, she was

13  indicating there was another stressor on her other

14  than the fact that at least momentarily she and

15  Dr. Dubin weren't getting along?

16  A.    Correct.

17  Q.    And when she wrote you and when she wrote this

18  particular letter, did you check with her to see that

19  her stress had been completely relieved or that she

20  was truly feeling as was reflected in that letter or

21  did you accept the letter as truth on the face of it?

22  A.    I know Sabrina, so I did talk to her about her

23  health and she was feeling better.

24  Q.    Okay.  And isn't it true, however, that despite

25  the fact that you received that letter in August of

VERONICA DELCOURT - ADVERSE

1   2008 and it reflected a remediation of a problem, at

2   least a concern, in an interaction that Dr. Dubin had

3   with a student, you forwarded Sabrina's earlier e-mail

4   describing her stress as your support for firing

5   Dr. Dubin?

6   A.   I did.

7   Q.   And when you forwarded the earlier e-mail in

8   support of firing Dr. Dubin for this episode which you

9   have now testified he remediated, you did not forward

10  that letter that is on the Elmo, did you?

11  A.   No, I didn't.

12  Q.   Nor did you inform anybody, when you forwarded

13  the negative news of the earlier e-mail from Sabrina,

14  did you inform anybody that this problem had been

15  remediated and that he was now one of her favorite

16  teachers?

17  A.   I don't recall that I did that.

18          MR. FOX:   That's all I have for you.   Thanks.

19          THE COURT:   Direct?

20          MR. PHILLIPS:   Thank you, Your Honor.

21                  (DIRECT EXAMINATION)

22          MR. PHILLIPS:   I don't have anything further.

23          THE COURT:   All right.   Do you want to

24  redirect, readverse direct?

25          MR. FOX:   I will do my best --

1           THE COURT:  Understood.

2           MR. FOX:   -- from what I can remember.

3                      CROSS-EXAMINATION

4    BY MR. FOX:

5    Q.   Let's go to that last topic.  The fact is that

6    you were informed shortly after you came on board at

7    MATC that Dr. Dubin had made a discrimination

8    complaint in relation to his hiring; isn't that true?

9    A.   No.

10   Q.   Well, let me show you then a document that's

11   labeled No. 54 and I want you to read that document to

12   see if that refreshes your recollection as to what

13   information you might have received shortly after you

14   came on board.  Do you see that document?

15   A.   I do.

16   Q.   Is that to you?

17   A.   It is.

18   Q.   And does that document contain an attachment

19   which refers to "Dubin complaint?"

20   A.   Yes.

21   Q.   And did you open the attachment and see what

22   complaint was enclosed?

23   A.   I would have opened the attachment to file it

24   electronically.  I know I didn't read it at this time.

25   Q.   I see.  So this was a faculty member named *Janet*

1  *Stevens* who sent you this document and this was a

2  document that you say you got.  Why don't we -- let's

3  describe the document.  In fact, why don't I put it on

4  the monitor so we know what we are talking about here.

5            THE COURT:  This is something you intend to

6  show the jury?

7            MR. FOX:  I do.

8            THE COURT:  Okay.

9  BY MR. FOX:

10 Q.   This is Exhibit 54.  And would you agree with me,

11 ma'am, that that is a message that was sent from

12 you -- sent to you from Janet Stevens?

13 A.   Yes, that's correct.

14 Q.   And that -- hold on just a minute.  Yeah, it is

15 the document I wanted.  Do you see the message there?

16 It says "Subject:  A response more for the weekend

17 reading"; June 2007 e-mail to Strycker from Stevens

18 regarding Dubin complaint; do you see that?

19 A.   Yes.

20 Q.   That was sent to you on 8/24/2007, correct?

21 A.   Correct.

22 Q.   How long had you known Mike Dubin at that point?

23 A.   I don't know if we had even met at that point.

24 Q.   I don't think you did meet by that -- is it true

25 that you had not even met Mr. Dubin when you received

1   that?

2   A.   It's likely I did not meet him.

3   Q.   And isn't it true, ma'am, that you opened the

4   attachment to that document?

5   A.   Yes.

6   Q.   And isn't it true that that involved one faculty

7   member talking about what another faculty member had

8   done concerning a discrimination complaint?

9   A.   Yes.

10  Q.   And that therefore isn't it true, ma'am, that you

11  were alerted to the fact before you even met Mike

12  Dubin that he had filed a discrimination complaint

13  against MATC?

14  A.   I'm not really sure when I really learned the

15  details about that complaint.

16  Q.   I didn't ask about details, ma'am; I'm just

17  asking you about the fact, which I thought I heard you

18  deny, but I will ask it again.   Isn't it true, ma'am,

19  that you were alerted to the fact that he had filed a

20  discrimination complaint against MATC before you even

21  met the man?

22  A.   If this e-mail is that attachment that you are

23  talking about, then this would have been sent to me.

24  It doesn't mean that I was --

25  Q.   Well, do you know of any other e-mail that you

VERONICA DELCOURT - CROSS

1 | may have received that would have referred to "Dubin

2 | complaint?"

3 | A.   It doesn't mean that I was alerted.

4 | Q.   And do you know of any other complaint that he is

5 | alleged to have made other than a complaint of

6 | discrimination, ma'am?

7 | A.   No.

8 | Q.   So given that, isn't it likely true, ma'am, that

9 | this was about the discrimination complaint that he

10 | filed?

11 |         MR. PHILLIPS:   Your Honor, it's been asked

12 | and answered.

13 |         THE COURT:   You may answer that, but I do

14 | think that we can move on at that point.

15 | A.   Yes.

16 | Q.   And that was before you did the first classroom

17 | observation of Mr. Dubin, wasn't it?

18 | A.   Yes.

19 | Q.   So by the time you did the first classroom

20 | observation of Mr. Dubin, you knew of his complaint,

21 | did you not?

22 | A.   Yes.

23 | Q.   And the first classroom observation that you did

24 | of Mr. Dubin was on December 6th of 2007, wasn't it?

25 | A.   Yes.

1  Q.    And you showed us a document which contained your

2  thoughts.   I hope I can remember what document that

3  was.   Let's see if I can -- let me make sure I -- and

4  I apologize for my disorganization.   I wouldn't get

5  graded well on it.   Let's look at your exhibit.   This

6  is Exhibit 4, it was shown to you, and those are

7  Probationary Faculty Evaluation Summary notes by you,

8  correct?

9  A.    Correct.

10 Q.    Now, those notes aren't shared by you, those

11 notes on that document, meaning the document itself,

12 weren't shared by you with Mr. Dubin?   You didn't show

13 him the document you wrote, did you?

14 A.    No.

15 Q.    And as a matter of fact, so he didn't see how it

16 was that you had characterized his teaching

17 performance on that document that you have now

18 testified to, did he?

19 A.    No.

20 Q.    But you did have a conversation with him then

21 following your making of that document and that

22 conversation occurred on December 14th of 2007,

23 correct?

24 A.    Correct.

25 Q.    And in that 2007 -- when you had that

1  conversation with him, was that the first office

2  conversation that you had with him?

3  A.   Was that the first -- pardon?

4  Q.   Office conversation you had with him, meeting.

5  A.   Yes.

6  Q.   Okay.  So the very first.  So this was an office

7  conversation you had with him after you received the

8  information we have shown you about the discrimination

9  complaint, correct?

10 A.   Correct.

11 Q.   And in that office conversation with Mr. Dubin,

12 did Mr. Dubin bring up the subject of the fact that he

13 had filed a complaint?  That's a yes or no question.

14 Did he bring up that subject?

15 A.   No.

16      MR. PHILLIPS:  Your Honor, I would object to

17 counsel characterizing the way she should respond.

18      THE COURT:  I will overrule the objection.

19 You may continue.

20 BY MR. FOX:

21 Q.   Okay.  So you brought up the subject, right?

22 A.   Well, I have made a mistake here.  This was the

23 second meeting that we would have had.  We had a

24 meeting prior to, probably in September, when he came

25 to my office.  It wasn't about his classroom

1  observation.  I don't remember the actual nature for

2  why we were meeting, but I do remember telling him at

3  that point that I was familiar that he had had a

4  complaint in the past and that I wanted to move

5  forward.  This was not the same meeting.

6  Q.   I see.  So this was another meeting that you had

7  with him.  You had a meeting with him in December and

8  it's your testimony that at the meeting in December

9  you didn't bring up the complaint --

10  A.   Correct.

11  Q.   -- is that right?  You didn't even mention the

12  complaint in the meeting in December?

13  A.   Correct.

14  Q.   You didn't tell him it had any effect on the way

15  that you were evaluating him in the classroom?

16          THE COURT:  Counsel, this has been asked and

17  answered now.

18          MR. FOX:  Okay.

19  BY MR. FOX:

20  Q.   But at that meeting you told him that you were

21  going to give him a document called a *Performance*

22  *Improvement Letter*; is that correct?

23  A.   Performance Improvement Letter?

24  Q.   I don't know if I have the exact -- a *Process*

25  *Improvement Letter*, is that the real title for it, a

VERONICA DELCOURT - CROSS

1  *Process Improvement Letter*?

2  A.   A Professional Growth Plan Improvement?

3       THE COURT:  The letter that you ended up

4  sending after this meeting, did you have a name for

5  it?

6       THE WITNESS:  It was just a performance

7  improvement.

8  BY MR. FOX:

9  Q.   Didn't you testify in your deposition it was

10  called a *Process Improvement Letter* and it was the

11  only one that you had ever issued?

12  A.   I probably just got the wording wrong.  It was

13  about performance improvement.

14  Q.   So you previously testified it was a Process

15  Improvement Letter, it was the only one that you

16  issued, but you were mistaken?

17       THE COURT:  That's compound, counsel.  Could

18  you break it down?

19  BY MR. FOX:

20  Q.   Okay.  You previously testified that it was a

21  Process Improvement Letter, didn't you?

22  A.   I don't know.

23  Q.   And you previously testified that it was the only

24  one that you had ever issued, didn't you?

25  A.   I don't know.

VERONICA DELCOURT - CROSS

1  Q.   It was in fact the only Process Improvement

2  Letter that you issued, wasn't it?

3  A.   No.  I gave a letter to Julia Haseleu about

4  performance improvement.  I gave a letter to Michael

5  about performance improvement.

6  Q.   And now you referred to the document that we have

7  marked as Exhibit 26 and Exhibit 26 is a document that

8  you prepared after you had discussions with Mr. Dubin

9  and he suggested to you what it was that he would do

10  to address some of the issues that you had raised on

11  December 14th, correct?

12  A.   Correct.

13  Q.   And you then, in your own words, capsulized his

14  responses on a letter that once again went to him with

15  what you believed to be his responses in terms of how

16  he was going to improve, right?

17  A.   No, no.  I wrote up this letter with his

18  responses, but I showed it to him to make sure that it

19  was an accurate depiction of his responses and then I

20  gave it to him.

21  Q.   And at that time when you talked to him about

22  whether it was an accurate depiction of his responses,

23  did you tell him that any of his responses to the

24  concerns you raised were improper or in any way

25  problematic?

1  A.   No.

2  Q.   And in the parlance of your evaluation system,

3  what he proposed to do was called a *remediation*

4  *effort*, correct?

5  A.   Correct.

6  Q.   And if in fact he remediated the concerns that

7  you had addressed in that particular letter, that was

8  not to be used against him with regard to a

9  non-renewal recommendation; isn't that true?

10 A.   That is true.

11 Q.   And yet you say at the bottom of the letter that

12 the letter is going to be kept in his file and will be

13 part of his non-renewal file?

14 A.   Nonrenewal --

15 Q.   I will read it to you.  "As with this first

16 letter, please note that this letter is only meant to

17 document my concerns and that no action is being taken

18 at this time.  This letter will be filed and kept as

19 supporting documents for final review at the end of

20 your probationary period."  So that letter was kept to

21 supply to someone if you recommended renewal or you

22 recommended nonrenewal, right?

23 A.   Right.

24 Q.   And that's despite the fact that it wasn't

25 supposed to if he remediated --

37

1          THE COURT:  It's been asked and answered,

2   counsel.

3          MR. FOX:   Okay.

4   BY MR. FOX:

5   Q.    One of the things that you talked about in

6   somewhat of a critical manner was the fact that

7   Dr. Dubin had chosen to teach classes at Edgewood?

8   A.    That's correct.

9   Q.    And isn't it true that one of the things that was

10  happening as a result of Dr. Dubin teaching classes at

11  Edgewood was that Edgewood students were coming over

12  to MATC to take some of his classes at MATC?

13  A.    I wouldn't know that.

14  Q.    Did you ever ask him about that?

15  A.    No.

16  Q.    Did you ever ask him anything about what he

17  thought the advantage of teaching at Edgewood was?

18  A.    No.

19  Q.    After he told you that he was going to switch his

20  scheduling over at Edgewood so that he was going to

21  have an extra half hour or whatever it was to get out

22  of the parking lot and transfer back and forth between

23  the two schools, run back and forth for his teaching

24  duties, did you ever tell him that that wasn't enough?

25  A.    No.

1    Q.    Did you ever tell him, at least as I understood

2    you to suggest today, that there was too much time --

3    in your mind, it would take too much time to get out

4    in the parking lot and go from one school to another

5    after he adjusted his schedule as he did?

6    A.    I told him it was still a concern, that 45

7    minutes was still a concern for me.

8    Q.    When did you tell him that?

9    A.    When we discussed it at his meeting about the

10   letter.

11   Q.    And refer to the documentation where you said

12   "It's still a concern to me despite your having

13   changed your schedule."   Please point out the

14   documentation of that.

15   A.    It isn't documented.

16   Q.    Okay.   Now, in addition to, as part of the

17   faculty assessments -- and there are a number of

18   things to go over here, but I'll -- one of the things

19   I want to get to as quickly as I can is this paragraph

20   that you were shown.   Now, that is the paragraph that

21   you claim was used to support your recommendation that

22   Dr. Dubin not be renewed because of his absences,

23   correct?

24   A.    Correct.

25   Q.    And you have already testified that to the extent

VERONICA DELCOURT - CROSS

1    that you notified him of his absences, you did so on

2    January 27th in your letter that said his absences

3    were a problem, correct?

4    A.    Correct.

5    Q.    The paragraph doesn't contain any information

6    post January 27th, 2009, does it?

7    A.    No.

8    Q.    Do you want to look at it?

9    A.    No, it does not.

10   Q.    Does it tell anybody that he has done anything at

11   all in the spring semester with regard to improving

12   his absences or not improving his absences as you

13   expected him to do after you gave him notice?

14   A.    It does not show that.

15   Q.    Why wouldn't you tell people -- why wouldn't you

16   go look to see what the accurate figures were with

17   regard to his absences in order to give a full picture

18   of whether or not he had improved as you had asked him

19   to do?

20          MR. PHILLIPS:   Objection, misstates her

21   testimony.

22          MR. FOX:   I will withdraw that.   I will

23   withdraw the question.

24   BY MR. FOX:

25   Q.    Did you in fact, before that paragraph was sent,

                    VERONICA DELCOURT - CROSS

1    go and get the accurate number of absences that he had

2    in the spring semester, you yourself confirm them and

3    see to it that the paragraph was supplemented with

4    those absences?

5    A.    No, I didn't.

6            MR. PHILLIPS:  Actually, puts facts in the

7    record that aren't there.

8            THE COURT:  I will sustain the objection.

9    BY MR. FOX:

10   Q.    Okay.  I'm sorry.  I was referring to the

11   absences in the spring semester of 2009.  Are there

12   any absences in the spring semester of 2009 on the

13   paragraph?

14           THE COURT:  Is it spring of 2009?

15           MR. FOX:  Spring semester of 2009.

16   A.    No.

17           THE COURT:  And was that data available?  In

18   other words, had the spring semester been completed?

19           THE WITNESS:  No.

20   BY MR. FOX:

21   Q.    But was the data with regard to how many times he

22   had been absent up to the point where it was

23   submitted?  In other words, how he had improved in the

24   spring semester, as you asked him to do, was that

25   available?

1  A.   Yes.

2  Q.   Now, part of the evaluation process that you --

3  that was standard operating procedure at MATC was for

4  the faculty member to do a Professional Growth Review

5  and Self-Assessment form, correct?

6  A.   Correct.

7  Q.   And did Mr. -- did Dr. Dubin prepare those types

8  of assessment forms and present them to you and

9  discuss them with you?

10 A.   Yes, he would have done that.

11 Q.   And did you sign off on those self-assessment

12 forms?

13 A.   I would have done that.

14 Q.   And in signing off, did you add any notes as to

15 why what he was viewing as his own performance was in

16 any way inaccurate?

17 A.   If it was, I would have made notes of it.

18 Q.   And you would have not let him get away with a

19 self-assessment where he thought he was deluding

20 himself, would you?

21 A.   No.

22 Q.   Now, with regard to the student surveys, I want

23 to get that down because we have had some testimony

24 that those are collected by the administration or at

25 least the data is synthesized by the administration.

VERONICA DELCOURT - CROSS

1    Excuse me.  I don't know if *synthesized* is the word.

2    Let me withdraw the question and I will start again.

3    How are the student forms where they give assessments

4    of teachers distributed?

5    A.   I don't really know that process.

6    Q.   That's all I want to know, if you don't know

7    that.  How is the data that the students give back,

8    the feedback that they give back, how is that

9    collected?

10   A.   It's sent to the teachers and the teachers are

11   supposed to bring them to me.

12   Q.   Is it sent to the teachers in raw form?  In other

13   words, is it sent to the teachers in these types of

14   percentages?  I will put this, for your view, on

15   there.  The teachers receive these, somehow receive

16   this, as percentages like Exhibit 20?

17   A.   I said I really don't know.  I don't know how

18   they receive them.

19   Q.   Well, isn't it true, ma'am, that administration

20   keeps track of these surveys in order to monitor what

21   students think of their -- the various classes being

22   taught at MATC?

23   A.   Not as you would expect.

24   Q.   Well, I'm -- at MATC, isn't it true that the

25   administration, that this isn't a tool that was

VERONICA DELCOURT - CROSS

1  developed by administration to give them feedback on

2  faculty performance?

3  A.    Yes.

4  Q.    Did you ever ask anybody from administration to

5  see the surveys that pertained to Dr. Dubin?

6  A.    No.

7  Q.    Did you ever try to compare the surveys that

8  pertained to Dr. Dubin with the surveys that pertained

9  to other faculty members, probationary faculty

10  members, who were supposed to be treated the same way?

11  A.    No.

12  Q.    Do you know how Dr. Dubin at all compares, in

13  terms of his performances perceived by the student on

14  these surveys, with other faculty members?

15  A.    No.

16  Q.    The fact is, he compares quite favorably, doesn't

17  he?

18  A.    I don't know.

19  Q.    But the students surveys are one of the

20  instruments that the collective bargaining agreement

21  directs you to take into account?

22  A.    For probation?

23  Q.    For probationary faculty evaluation.

24  A.    It asks for all student assessments.  The surveys

25  are not the only way we would assess students.

VERONICA DELCOURT - CROSS

1   Q.    Is the survey a student assessment?

2   A.    One of them.

3   Q.    Okay.  So if it asks for all student assessments,

4   that would be included in the term *all student*

5   *assessments*?

6   A.    It asks for student assessments.

7   Q.    And did you ever tell Mr. Dubin, "Gees, you are

8   not bringing them to the meeting.  Bring them to me

9   next Friday because I really want to see how the

10  students, as a whole, are viewing it"?

11  A.    When I meet with them about their classroom

12  observations, I do ask, if they don't bring them, I do

13  ask all probationary faculty to bring them.

14  Q.    Can you ever tell me an instance where Dr. Dubin

15  came to you, as you claim, and he didn't have his

16  faculty assessments, where you told him, "Dr. Dubin,

17  get your faculty assessments from the administration

18  or wherever you get them from and then bring them to

19  me next Wednesday"?

20  A.    Yes, I would have done that.

21  Q.    And have you ever documented, in any of the

22  writings you have done, that he missed a meeting with

23  you where you had asked him to bring these student

24  assessments and he didn't bring them?  Do you have a

25  document that you know of that says that?

 1  A.   My documentation of the student assessment

 2  summaries, that bottom line that says they didn't

 3  bring them in would be my cue that I would have asked

 4  the faculty member to bring them to me.

 5  Q.   Well, what you are talking about is that you

 6  asked them to bring them at the meeting you had.  I'm

 7  talking about if they didn't bring them and you asked

 8  them to bring them at a later date.

 9  A.   That is what I'm saying.

10  Q.   Okay.  When can you point out that Dr. -- you

11  said a later date for Dr. Dubin to bring the

12  assessment.  You tell me when you did that and when he

13  failed to bring them in in accordance with your

14  directive.

15  A.   I would have asked Dr. Dubin just to get his

16  student assessments to me sometime that semester soon.

17  I wouldn't have given him a specific date.

18  Q.   Well, let's -- maybe I will approach it this way:

19  You put the reasons in your January 27th letter why

20  you were recommending that he not be renewed, right?

21  A.   Correct.

22  Q.   And you supplied the information supporting your

23  recommendation to the Board, including all the

24  documentation and all the reasons that you have,

25  right?

1  A.    Right.

2  Q.    You did not say in the letter of January 27th

3  that Dubin had in any way not brought his student

4  assessments to you, did you?

5  A.    No.

6  Q.    You did not tell the Board that you were voting

7  to nonrenew him or critical of him in any way because

8  he failed to bring student assessments to you, did

9  you?

10  A.    No.

11  Q.    By the way, just to put this in perspective, with

12  regard to complaints about faculty, isn't it true that

13  you have testified that 20% of the faculty members

14  experience student complaints?

15  A.    I don't know if I said that or not.

16  Q.    Not only did you say that, didn't you say it was

17  not uncommon for faculty members to get student

18  complaints?

19  A.    It is not uncommon.

20  Q.    And that's because students can differ with

21  faculty about the curriculum or style and sometimes it

22  may be the faculty member's fault and sometimes it's

23  the student's fault, correct?

24  A.    Correct.

25  Q.    For example, if a student doesn't show up for an

VERONICA DELCOURT - CROSS

1   exam or doesn't pick up an exam, that is something at

2   least you should hold the student accountable for,

3   shouldn't you?

4   A.   Yes.

5   Q.   Now, you indicated in response to the questions

6   that you were asked by your counsel that you did

7   receive communications from some faculty members

8   indicating that they were supportive of Dr. Dubin and

9   that they believed him to be a good colleague,

10   correct?

11   A.   Correct.  Yes.

12   Q.   And you forwarded those, along with your

13   criticism of his, with his --

14        MR. GOLD:  I apologize.

15   BY MR. FOX:

16   Q.   -- you forwarded those, didn't you, along with

17   your criticisms so that whoever was going to get your

18   recommendation of renewal got a balanced view as to

19   what Dr. Dubin's true relationships were with the

20   faculty, right?

21   A.   I don't really understand the question.

22   Q.   Did you forward any of the good news, with regard

23   to Dr. Dubin's faculty relationships that was sent to

24   you, to anybody who was considering whether or not to

25   approve your renewal --

1  A.    No.

2  Q.    -- or nonrenewal recommendation?  And did you not

3  do so for the same reason that you didn't forward the

4  letter from Sabrina indicating that Dr. Dubin had

5  become one of her favorite teachers and had remedied

6  all the problems?

7  A.    Not for the same reason, no.

8  Q.    Now, with regard to a number of things --

9           MR. FOX:  No.  Actually, that's it.  Thank

10  you.

11          THE COURT:  Thank you, counsel.  Brief

12  redirect, if you would like.

13                    (REDIRECT EXAMINATION)

14       (Conclusion of transcript excerpt.)

15                          ***

16

17

18

19

20

21

22

23

24

25

VERONICA DELCOURT - CROSS

1          I, CHERYL A. SEEMAN, Certified Realtime and

2     Merit Reporter, in and for the State of Wisconsin,

3     certify that the foregoing is a true and accurate

4     record of the proceedings held on the 2nd day of May,

5     2011, before William M. Conley, Chief Judge of the

6     Western District of Wisconsin, in my presence and

7     reduced to writing in accordance with my stenographic

8     notes made at said time and place.

9     Dated this 3rd day of May, 2011.

15                              _____/s/_____

16                              Cheryl A. Seeman, RMR, CRR
                                Federal Court Reporter

23     The foregoing certification of this transcript does not
       apply to any reproduction of the same by any means unless
24     under the direct control and/or direction of the
       certifying reporter.